686 A.2d 298

**Abdolrahman M. ADLOO et al.,**

v.

**H.T. BROWN REAL ESTATE, INC.**

**No. 143, Sept. Term, 1995.**

Court of Appeals of Maryland.

Dec. 16, 1996.

**256**

Barbara Gold, Baltimore (Philip Howard Gold, on brief), Ellicott City, for Petitioner.

Edward J. Brown (McCarthy, Wilson & Ethridge, on brief), Rockville, for Respondent.

Argued before MURPHY,\* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

BELL, Judge.

In this case, we are asked to resolve whether, as a matter of law, clauses in a real estate listing contract between the petitioners, Abdolrahman Adloo, and Monireh, his wife, and

---

\* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

the respondent H.T. Brown Real Estate, Inc., and in a related lock-box authorization are exculpatory clauses, which absolve the real estate company from liability for its future negligence. The Circuit Court for Montgomery County having denied the respondent's motion for judgment premised on the clauses being exculpatory, the jury returned a verdict in favor of the petitioners. The respondent successfully appealed to the Court of Special Appeals, which, in an unreported opinion, held that "a provision in an agreement between homeowners and their real estate broker exculpating the broker from any liability for the loss of the homeowners' personal property . . . is enforceable." We granted the petitioner's petition and issued the writ of certiorari to consider the issue.[1] We shall reverse the judgment of the intermediate appellate court.

## I

The petitioners entered into an exclusive listing agreement with the respondent for the sale of the petitioner's home. That listing agreement contained the following clause:

> Neither REALTOR nor his agents or sub-agents are responsible for vandalism, theft or damage of any nature whatsoever to the property, nor is REALTOR responsible for the custody of the property, its management, maintenance, upkeep or repair.

It also provided that the petitioners' home would be available for showing "at all reasonable hours."

Consistent with the latter provision and in order to facilitate the showing of the petitioners' home, the petitioners subsequently executed a lock-box authorization.[2] Pursuant to that

---

1. Although both parties addressed a second issue, the sufficiency of the evidence to support the jury's verdict, we were asked to grant certiorari, and in fact we granted certiorari, on only one issue, the validity and effect of the exculpatory clauses. Accordingly, the sufficiency of the evidence is not before us and we shall refrain from addressing it.

2. The listing agreement and the lock box authorization were standardized realtor contracts used in Montgomery and Prince George's counties, respectively. Given our view of the issue, it is not necessary that

authorization, the petitioners agreed to the installation and use of a lock-box device, which allowed their home to be shown without either the petitioners or the respondent's agent being present. While the respondent instructed the petitioners to disengage the security system monitoring their home to allow access to the home, the authorization cautioned the petitioners to "safeguard" their valuables. It also contained the following provision:

> SELLER further acknowledges that neither Listing or Selling BROKER nor their agents are an insurer against the loss of personal property; SELLER agrees to waive and releases BROKER and his agents and/or cooperating agents and brokers from any responsibility therefore [sic].

The respondent received a telephone call from a man who identified himself as Alvin Harris and represented that he was an agent of Shannon and Luchs, another real estate broker. Informing the respondent's employee of his intention to show the petitioners' home that afternoon, "Mr. Harris" requested, and eventually secured, the lock-box combination.[3] In providing that information, the employee followed the respondent's established policy of verifying the *bona fides* of the caller, his identity and affiliation with the named agency, by calling, without first conducting any independent investigation, the number the caller gave her. Subsequently, it was discovered that the caller was an impostor; Shannon and Luchs did not have an agent named Alvin Harris. According to the records of the Maryland Real Estate Commission, no real estate license has been issued in that name, and the number given to the respondent's employee was not a Shannon and Luchs number. It was also discovered that cash, jewelry, and other

---

we address the petitioners' argument concerning the propriety of the use of these forms in Montgomery County.

3. The lock-box, which contained the key to the house, placed on the petitioners' house was a combination lock-box; thus, it could be opened only by using the correct combination.

property totalling nearly $40,000 had been taken from the petitioners' home.

Having filed, and settled, a claim with their insurance carrier, the petitioners sued the respondents for damages. Following a trial in the Circuit Court for Montgomery County, the jury awarded them $20,000. The respondent noted an appeal to the Court of Special Appeals. The intermediate court reversed the judgment of the circuit court. In an unreported opinion, characterizing it as an exculpatory clause, that court held that the lock-box authorization provision, quoted above, was valid and enforceable and, thus, precluded the petitioners' claim. We granted certiorari, at the petitioners' request, to consider this important issue.

## II

### A.

■ It is well settled in this State, consistent with "the public policy of freedom of contract," *see Wolf v. Ford,* 335 Md. 525, 531, 644 A.2d 522, 525 (1994), that exculpatory contractual clauses generally are valid. *Id.; Eastern Ave. Corp. v. Hughes,* 228 Md. 477, 480, 180 A.2d 486, 488 (1962) [4]; *Atty. Griev. Comm'n v. Owrutsky,* 322 Md. 334, 350, 587 A.2d 511, 518 (1991); *Sullivan v. Mosner,* 266 Md. 479, 494–96, 295 A.2d 482, 490–91 (1972); *Baker v. Roy H. Haas Associates, Inc.,* 97 Md.App. 371, 377, 629 A.2d 1317, 1320 (1993); *Schrier v. Beltway Alarm Co.,* 73 Md.App. 281, 286, 533 A.2d 1316, 1318 (1987); *Boucher v. Riner,* 68 Md.App. 539, 548, 514 A.2d 485, 490 (1986); *Winterstein v. Wilcom,* 16 Md.App. 130, 135, 293 A.2d 821, 824, *cert. denied,* 266 Md. 744 (1972). Aside

---

4. At issue in that case was an exculpatory clause in a lease for a residential property. Subsequent to our holding such a clause valid and enforceable, the General Assembly enacted legislation declaring exculpatory clauses in real property leases to be void as against public policy. Ch. 124, Acts of 1964, now codified at Maryland Code (1974, 1988 Repl.Vol.) § 8–105 of the Real Property Article. *See Prince Philip Partnership v. Cutlip,* 321 Md. 296, 298, 582 A.2d 992, 992–93 (1990).

from legislation proscribing such clauses,[5] this Court, in *Wolf v. Ford,* 335 Md. at 531–32, 644 A.2d at 525–26 (citing *Wilcom,* 16 Md.App. at 135–36, 293 A.2d at 824, Restatement (Second) Contracts § 195(1) (1981), and W. Page Keeton, *et al.,* Prosser and Keeton on the Law of Torts, § 68, at 482 (5th ed. 1984)), identified three circumstances in which exculpatory clauses in contracts are invalid and will not be enforced: when a party to the contract attempts to avoid liability for intentional conduct or harm caused by reckless, wanton, or gross behavior; when the contract results from grossly unequal bargaining power; and when the transaction is one adversely affecting the public interest. We also noted that this last exception

> includes the performance of a public service obligation, e.g., public utilities, common carriers, innkeepers, and public warehousemen. It also includes those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be "patently offensive," such that " 'the common sense of the entire community would pronounce it' invalid,"

*id.* at 532, 644 A.2d at 526 (quoting *Md. Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 606, 386 A.2d 1216, 1228 (1978), in turn quoting *Estate of Woods, Weeks & Co.,* 52 Md. 520, 536 (1879), and the standard by which it is measured is a

---

5. In addition to the legislation discussed in note 4 *supra, see* Maryland Code (1974, 1989 Repl.Vol., 1993 Cum.Supp.), § 5–305 of the Courts and Judicial Proceedings Article. That section provides:

 A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relating to the construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance, including moving, demolition and excavating connected with it, purporting to indemnify the promisee against liability for damages arising out of bodily injury to any person or damage to property caused by or resulting from the sole negligence of the promisee or indemnitee, his agents or employees, is against public policy and is void and unenforceable. This section does not affect the validity of any insurance contract, workers' compensation, or any other agreement issued by an insurer.

 *See also Heat & Power v. Air Products,* 320 Md. 584, 592–93, 578 A.2d 1202, 1206 (1990); *Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 195, 498 A.2d 605, 611 (1985).

strict one. See *Anne Arundel Co. v. Hartford Accident,* 329 Md. 677, 686–88, 621 A.2d 427, 431–32 (1993); *Finci v. American Casualty,* 323 Md. 358, 376–79, 593 A.2d 1069, 1077–78 (1991).

While we have clearly defined when exculpatory clauses in contracts are valid, there is a threshold issue that must be considered prior to addressing that inquiry: whether the clause at issue is, in fact, an exculpatory clause. Stated differently, the question is the adequacy of the clause to shield one of the parties from liability. That issue turns on the intention of the parties. As in the case of statutory construction, determining the intention of the parties to a contract involves construing the language of the contract, more particularly, the words of the subject clause. *Highley v. Phillips,* 176 Md. 463, 5 A.2d 824 (1939); *Fidelity & Deposit Co. v. Mattingly Lumber Co.,* 176 Md. 217, 4 A.2d 447 (1939); *Rollins v. Bravos,* 80 Md.App. 617, 565 A.2d 382 (1989), *cert. denied,* 318 Md. 515, 569 A.2d 644 (1990). In the cases involving exculpatory clauses, decided by this Court and also by the Court of Special Appeals, cited above, no question concerning the meaning of the clause was raised, only its applicability to the situation presented. Consequently, in those cases, only the latter issue was addressed.

This Court has addressed the former issue, however. In *Crockett v. Crothers,* 264 Md. 222, 285 A.2d 612 (1972), the Court was required to construe the following paragraph:

The obligations of the CONTRACTOR under this Article 32 shall not extend to the liability of the ENGINEER, his agents or employees arising out of (a) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications or (b) the giving of or the failure to give directions or instructions by the ENGINEER, his agents or employees provided such giving or failure to give is the primary cause of injury or damage.

*Id.* at 228, 285 A.2d at 615. Noting the general rule— "contracts will not be construed to indemnify a person against his own negligence unless an intention to do so is expressed in

those very words or in other unequivocal terms," *id.* at 227, 285 A.2d at 615 (citing *Blockston v. United States,* 278 F.Supp. 576, 591 (D.Md.1968); *Farrell Lines, Inc. v. Devlin,* 211 Md. 404, 421–22, 127 A.2d 640, 648–49 (1956); 24 Md. L.Rev. 66 (1964))—construing the paragraph, we agreed with the trial court that the appellee "did not agree in so many words or otherwise unequivocally—indeed did not agree at all—to indemnify Crockett against his own negligence." *Id.* at 228, 285 A.2d at 615. *See also Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990).

Similarly, in *Home Indem. Co. v. Basiliko,* 245 Md. 412, 226 A.2d 258 (1967), the Court was called upon to construe the following clause:

Landlord shall not be responsible for loss of or damage to property of Tenant in said building caused by fire or other casualty, or by any acts of negligence of co-tenants or other occupants of said building or any other person, or by rain or snow or water or steam that may leak into or flow from said building through any defects in the roof or plumbing or from any other source.

*Id.* at 414, 226 A.2d at 259. The issue was "whether ... the exculpatory clause in the lease absolved the lessors from damages caused by the leaking air conditioning unit." The appellant in that case contended that, because its words were susceptible of more than one meaning and the instrumentality which caused the damage was not definitively identified, the clause should have been construed against the lessors. Noting that "the wording of the exculpatory clause is not ambiguous" and "its meaning is not uncertain," *id.* at 417, 226 A.2d at 260, this Court affirmed the judgment in favor of the appellees. We explained:

The rule that a lease must be construed most strongly against a lessor and in favor of a lessee [6] is only to be

---

**6.** This general rule of construction, *see Standard Garments v. Hoffmann,* 199 Md. 42, 47, 85 A.2d 456, 458 (1952), is inconsistent neither with what the petitioner argues nor the rule of construction reiterated in *Crockett v. Crothers,* 264 Md. 222, 285 A.2d 612 (1972).

resorted to when the words of the lease are doubtful in their meaning or susceptible of more than one construction.... As to the damage caused by water leaking into the premises of the tenants by way of the defective air conditioning unit, i[t] is clear, since the meaning of the words in the third category of causes are neither doubtful nor susceptible of more than one construction, that the lessors were not responsible for the damage suffered by the lessees. And this would be so regardless of whether or not the lessors were negligent in keeping the air conditioning unit in good repair. Furthermore, even if it is assumed that the unit was not a part of the plumbing system, it would not be unreasonable to include an air conditioning unit as another source from which leakage of water might be expected.

*Id.* at 417, 226 A.2d at 261 (citation omitted). *See Christhilf v. Mayor and City Council of Baltimore,* 152 Md. 204, 208, 136 A. 527, 528 (1927).

Courts in other jurisdictions apply the same analysis. *Alack v. Vic Tanny International,* 923 S.W.2d 330, 334 (Mo.1996)(quoting *Hornbeck v. All American Indoor Sports, Inc.,* 898 S.W.2d 717, 721 (Mo.App.1995) ("contracts exonerating a party from acts of future negligence are to be 'strictly construed against the party claiming the benefit of the contract, and clear and explicit language in the contract is required to absolve a person from such liability.' "); *Audley v. Melton,* 138 N.H. 416, 640 A.2d 777, 779 (1994) (language of release clearly and specifically must indicate intent to release the defendant from liability for personal injury caused by the defendant's negligence; general release language does not suffice); *Michel v. Merrill Stevens Dry Dock Company,* 554 So.2d 593, 595 (Fla.App.1989)(exculpatory contracts relieving a party of his or her own negligence are valid and enforceable where such intention is made clear and unequivocal in the contract); *Baker v. Stewarts', Inc.,* 433 N.W.2d 706, 709 (Iowa 1988) ("[contract provisions that are subject to construction which a party claims relieve him from liability for his own negligence] are not held to cover such negligence unless the intention to do so is clearly expressed."); *Colgan v. Agway,*

*Inc.*, 150 Vt. 373, 553 A.2d 143, 145 (1988) ("a greater *degree* of clarity is necessary to make the exculpatory clause effective than would be required for other types of contract provisions.") (emphasis added); *Larsen v. Vic Tanny International*, 130 Ill.App.3d 574, 85 Ill.Dec. 769, 771, 474 N.E.2d 729, 731 (1984) ("exculpatory contracts or clauses are subject to the general rule that they are to be construed most strongly against their maker"); *Wenzel v. Boyles Galvanizing Co.*, 920 F.2d 778, 781 (11th Cir.1991). See *University Plaza Shopping Center, Inc. v. Stewart*, 272 So.2d 507, 509 (Fla.1973), in which the Florida Supreme Court applied the principle in the same context as this Court has done—to the construction of an indemnity clause in a contract.

The standard thus developed and required is a stringent and exacting one, under which the clause must not simply be unambiguous but also understandable. *Alack*, 923 S.W.2d at 334.[7] Just how stringent and exacting may be demonstrated by reviewing a few of the cases.

*Audley, supra*, 138 N.H. 416, 640 A.2d 777, was a negligence action by a model, who had been bitten on the head by a lion during a photography shoot. *Id.* 640 A.2d at 778. The photographer moved to dismiss, relying on the following release:

> I ... realize that working with the [sic] wild and potentially dangerous animals (i.e. lion, white tiger, hawk) can create a hazerdous [sic] situation, resulting in loss of life or limb. I take all responsibility upon myself for any event as described above that may take place. I hold Bill Melton and

---

**7.** The Missouri Supreme Court has said that it is a "well-established rule of construction that a contract provision exempting one from liability for his or her negligence will never be implied but must be clearly and explicitly stated." *Poslosky v. Firestone Tire and Rubber Co.*, 349 S.W.2d 847, 850 (Mo.1961). Maryland has applied that rule of construction but only in the context of an indemnity clause. We see no reason, when the effect of the two clauses is the same to approach their interpretation from a different analytical premise; if a rule of construction is applicable to the interpretation of one clause, it should also be applicable to the interpretation of the other.

T.I.G.E.R.S. or any of their agents free of any or all liability. I am signing this of my on [sic] free will.[8]

Denying the motion, the court explained:

The . . . release recognizes certain risks inherent in working with wild animals, and then promises to hold the defendant "free of any and all liability." Although this release insulates the defendant from liability for injuries inflicted by wild animals when no negligence on the part of the defendant is involved, it does not effectively release the defendant from liability based on his own negligence. Quite simply, the general release language does not satisfy the . . . requirement that "the contract must clearly state that the defendant is not responsible for the consequences of his negligence." . . . The release fails in this respect not because it fails to use the word "negligence" or any other special terms; instead it fails because no particular attention is called to the notion of releasing the defendant from liability for his own negligence. The general language in the context of the release simply did not put the plaintiff on clear notice of such intent.

640 A.2d at 779 (quoting *Barnes v. New Hampshire Karting Assn.*, 128 N.H. 102, 509 A.2d 151, 154 (1986)).

The exculpatory clause in *Baker, supra*, 433 N.W.2d 706, was:

I . . . do hereby acknowledge that this is a student training facility and thus there is a price consideration less than would be charged in a salon. Therefore, I will not hold the Stewart School, its management, owners, agents or students liable for any damage or injury, should any result from this service.

*Id.* Addressing the adequacy of the clause, the court said:

In reviewing the language of the exculpatory clause at issue in the present case, we do not believe that it would be

---

**8.** The photographer also relied on a sentence in the release directed toward proprietary rights: "I further release the photographer, his/her agents or assigns from any and all liability whatsoever."

apparent to the casual reader asked to sign this form as a condition for receiving cosmetology services that its effect was to absolve the establishment from liability based upon the acts or omissions of its professional staff. To construe the agreement in this light would be contrary to the requirement ... that such intention must be clearly and unequivocally expressed.

*Id.* at 709.

■ To be sure, as the weight of authority makes clear, *Hardage Enterprises, Inc. v. Fidesys Corporation,* 570 So.2d 436, 437 (Fla.App.1990), the exculpatory clause need not contain or use the word "negligence" or any other "magic words." *Id.; Audley,* 640 A.2d at 778; *Alack,* 923 S.W.2d at 335–36. Such a clause is sufficient to insulate the party from his or her own negligence "as long as [its] language ... clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence...." *Barnes,* 509 A.2d at 154.

■ This is consistent with the objective law of contract interpretation and construction, which Maryland follows. As explained in *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985), that means:

A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean. As a result, when the contractual language is clear and unambiguous, and in the absence of

fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract.

*Id.* at 261–62, 492 A.2d at 1310 (citations omitted). By parity of reasoning, when the clause is unclear and ambiguous, either the intention of the parties must be established through the introduction of relevant parol evidence or the issue resolved by strictly construing the clause against its author. *Dialist Co. v. Pulford,* 42 Md.App. 173, 399 A.2d 1374 (1979). *See Colgan, supra,* 553 A.2d at 145, in which the Vermont Supreme Court, noting the applicability of the objective law of contracts to the interpretation of exculpatory clauses, pointed out that, "[i]t is the degree of clarity that the language must convey in order to achieve a particular legal result which is the crucial question." *Id.* That means, in Vermont, the court said, that because "such disclaimers are exculpatory, they must be construed strictly against the party relying on them." *Id.*

 The critical issue on this appeal is whether the exculpatory clause in the lock-box agreement is sufficient to exculpate the respondent from liability resulting from its own negligence. The answer lies in the intention of the parties, which, under the objective law of contracts, is determined by the language of the subject clause. We agree with the petitioners that the clause is ambiguous and its scope is, at best, unclear. Because it does not clearly, unequivocally, specifically, and unmistakably express the parties' intention to exculpate the respondent from liability resulting from its own negligence, the clause is insufficient for that purpose.

The first sentence of the exculpatory clause recites that the respondent is not an insurer against the loss of the petitioners' personal property. The second sentence then relieves the respondent of the responsibility for any such loss. In short, it places the homeowner, as seller, on notice that the listing or selling broker is not "an insurer against the loss of personal property" and thus releases the broker from the responsibility of such losses. Very clearly that clause may logically be

interpreted as applying only to those situations in which, without negligence on the part of the respondent, a person to whom the house is being shown steals the petitioners' property. There is nothing in the clause or, indeed, in the context, that would suggest a different or broader intent. In fact, putting the matter in context leads to the conclusion that the parties did not contemplate that this clause would insulate the respondent from liability for it own negligence. We conclude that the exculpatory clause plainly does not address thefts occurring as a result of the respondent's negligence.

Nor does the exculpatory clause in the listing contract pass muster. That clause protects the respondent from responsibility for "vandalism, theft or damage of any nature to the property." [9] Here again, there simply is no clear, unequivocal expression of the parties' intention that included in that exclusion was damage or injury caused by the respondent's own negligence. Indeed, the clause is devoid of any language manifesting any such intention.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REINSTATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*

---

**9.** This clause may present yet another ambiguity, whether it refers to real or personal property, or both.